**In re SHERRY & O'LEARY,
INC., Debtor.**

**SHERRY & O'LEARY, INC., Plaintiff,**

**v.**

**TOM MISTICK & SONS, INC., a/k/a
Mistick Construction, and Seaboard
Surety Company, Defendants.**

**Bankruptcy No. 90–1487–BM.
Adv. No. 92–0233–BM.**

United States Bankruptcy Court,
W.D. Pennsylvania.

Dec. 16, 1992.

Robert J. Blumling, Sable, Makoroff & Gusky, P.C., Pittsburgh, PA, for plaintiff/debtor.

David M. Priselac, Pittsburgh, PA, for defendants.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the court is an action for turnover of a contract balance of $30,713.72 purportedly owed to Sherry & O'Leary, Inc. ("debtor") by defendant Tom Mistick & Sons, Inc. ("Mistick").

Debtor contends that Mistick has materially breached a construction contract by failing to pay debtor the full amount allegedly due for work performed under the contract. Debtor further contends that de-

fendant Seaboard Surety Company ("Seaboard"), surety of Mistick and of the owner of the construction project, is liable as surety for the unpaid contract balance.

Mistick denies that debtor is entitled to the amount claimed because debtor allegedly failed to perform in accordance with all the requirements of the contract. According to Mistick, debtor's failure to so perform resulted in "backcharges" which exceed the amount sought by debtor.

Seaboard asserts that debtor failed to comply with the terms and conditions of the surety bond by failing to give Seaboard timely notice of its claim against Mistick.

The reason for defendants' reluctance to go to trial is now obvious. We find no basis for the defense offered on behalf of either defendant. To the contrary, defendants' responsive pleadings and offerings at trial appear only to be an effort to delay an unfavorable but just result.

Judgment in the amount of $30,713.72 will be entered in favor of debtor. Defendants will be directed to turn over said amount to debtor forthwith.

–I–

## FACTS

Debtor is a mechanical contractor. Mistick is a general contractor which had contracted with Marriott Corporation on July 24, 1989 to construct a hotel known as "Courtyard By Marriott" ("the project").

On August 15, 1989, Mistick and Seaboard executed a payment bond in the amount of $4,634,336.00 in connection with the project. Seaboard guaranteed payment of valid claims pertaining to the project for labor and materials supplied for which Mistick did not pay.

On September 5, 1989, debtor and Mistick executed a contract whereby debtor agreed to install specified plumbing at the project. The base price of the contract was $365,000.00.

Debtor commenced working on the project shortly after execution of the contract. Several additional work orders to debtor were issued by Mistick during construction of the project. The total amount of these orders, which was added to the original contract price, was $28,680.56. The first change order was issued on October 10, 1989. The final order was issued on October 22, 1990.

The total amount due to debtor under the original contract and the additional work orders was $393,680.56.

Debtor filed a voluntary chapter 11 petition on May 17, 1990. Mistick has filed no proof of claim in the case. To the contrary, prior to the filing of the responsive pleading in the adversary in question, the record does not contain an indication by defendant that plaintiff owed it any sum whatsoever on any basis.

Debtor's second amended disclosure statement was approved by the court on August 9, 1991.

Schedule C, which was attached to the disclosure statement, listed all "bonded jobs" and "prime contractor jobs" in which debtor was involved. The order approving the disclosure statement provided that any claimant not included on the list who believed that they should be included must file an objection not less than twenty (20) days prior to hearing on plan confirmation scheduled for October 3, 1991. If further provided that any claimant who failed to file an objection or whose objection ultimately was overruled:

> ... shall be barred from asserting any claim to payment directly from the contract balances on the bonded projects or prime contractor bonded projects to which the claimants supplied labor and/or materials and shall be further barred from asserting any claim as to the applicable surety of the debtor or any prime contractor of the debtor on the respective bonded project.

Hanlon Electric Company and Penstan Supply Company were the only parties to file such objections.

Debtor's second amended plan of reorganization was confirmed on April 9, 1992. In accordance with the above provision in the order of August 9, 1991, the confirmation order provided that:

... no other claimant or creditor shall have any recourse, rights or remedies against any surety of the Debtor, surety of any prime contractor of the Debtor or any owner of any project ... Further, the aforementioned entities be and hereby are authorized to turn over to the Debtor any and all funds that may be withheld on any bonded or unbonded project so that such funds may be utilized in consummating its Plan and in carrying on its post-confirmation business activities.

The project owner paid Mistick in full upon completion of the project for work which it and its subcontractors, including debtor, had performed on the project. Mistick in turn paid the sum of $308,828.74 directly to the debtor and the sum of $54,-138.10 to Penstan Supply. It has refused, however, to pay debtor the balance of $30,-713.72 due under the original contract and the subsequent change orders.

On May 18, 1992, debtor's counsel sent letters to Seaboard and to the project owner notifying them that debtor had a claim against Mistick pursuant to the surety bond in the amount of $28,380.72.

On May 19, 1992, debtor filed the adversary proceeding which is now before the court. Trial on the matter was conducted on November 18, 1992, at which time all parties were permitted to present any evidence they deemed appropriate.

–II–

## ANALYSIS

### COUNT I

Debtor asserts in Count I of its complaint that Mistick's failure or refusal to remit the balance of $30,713.72 constitutes a material breach of the construction contract.

Mistick does not contest that the original contract price was $365,000.00 or that debtor performed additional work orders amounting to $28,680.56. Rather, Mistick denies that debtor is entitled to recover the contract balance and asserts that debtor failed to perform in accordance with all contract requirements. According to Mistick, debtor's failure to perform in accordance with these requirements resulted in "backcharges" which exceed the amount sought by debtor.

### A. SETOFF

The precise nature of the defense raised by Mistick is not entirely clear.

■ It is readily apparent that Mistick is *not* entitled to set off the alleged "backcharges" against the unpaid contract balance of $30,713.72.

Assertion of a setoff in a bankruptcy proceeding is governed by 11 U.S.C. section 553, which provides in pertinent part as follows:

(a) ... [T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....

■ Section 553 incorporates and preserves in bankruptcy the right to setoff which was available at common law. *See U.S. v. Norton*, 717 F.2d 767, 772 (3d Cir. 1983). Parties owing mutual debts are permitted to state the accounts between them, to subtract the one from the other, and to pay only the balance. This practice is grounded in avoiding the absurdity of "making A pay B when B owes A". *Matter of Bevill, Bresler & Schulman Asset Management*, 896 F.2d 54, 57 (3d Cir.1990) (citing *Studley v. Boylston National Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913)).

■ The following requirements must be met in order for setoff under section 553 to be permitted:

(1) a creditor must owe a prepetition debt to the debtor;

(2) the claim of the creditor against the debtor must have arisen prepetition; and

(3) the debt and the claim are mutual obligations.

*See In re Rinehart,* 76 B.R. 746, 749 (Bankr.D.S.D.1987), *reversed on other grounds,* 887 F.2d 165 (8th Cir.1989).

█ The right to setoff depends on the existence of mutual debts and claims between debtor and creditor. *See Matter of Bevill,* 896 F.2d at 57. Moreover, the mutual debts and claims all must have arisen prior to the filing of the bankruptcy petition. A creditor *may not* set off its *pre* petition claim against a debt owed to the debtor which arose *post* petition. *See Cooper–Jarrett, Inc. v. Central Transport, Inc.,* 726 F.2d 93, 96 (3d Cir.1984).

█ It also follows from the above requirements that a creditor cannot set off a *post* petition claim against a debt owed to the debtor which arose either *pre* petition or *post* petition.

This latter situation is present in this case. With only a few minor exceptions,[1] the "backcharges" upon which Mistick relies were incurred (if at all) *after* the petition was filed on May 17, 1990. A portion of the debt owed by Mistick to debtor arose *pre* petition while the remainder arose *post* petition.

## B. BACKCHARGES

Mistick's contention that debtor failed to perform in accordance with the provisions of their contract and that certain "backcharges" were incurred as a result is devoid of merit. None of the alleged "backcharges" is properly chargeable to debtor.

### i) *Temporary Water System*

█ The contract between debtor and Mistick called for debtor to install a temporary water system for use by other subcontractors working on the project. According to Mistick, it had to use its own employees to hook up the system and incurred $358.41 in labor costs when debtor failed to do the work.

The assertion that debtor failed to perform the work is erroneous. Mistick's project manager, who was in charge of the project, testified that he had no recollection

of debtor failing to provide temporary water for the site. The only evidence pertaining to this allegation submitted by Mistick was a document entitled "Cost Code Detail History Report". No witness with first-hand knowledge of the matter testified that debtor had failed to provide the hook up. To the contrary, defendant's own employee disputes this contention.

### ii) *Mildew Removal*

█ Mistick claims that debtor should be backcharged the sum of $1,064.58 for the recleaning of certain of the rooms in the project to remove mildew.

This backcharge is wholly unfounded. Mistick's project manager testified that the mildew was due to airborne moisture and was *not* due to any problems with the plumbing installed by debtor. Mistick offered no testimony establishing that the mildew was debtor's fault.

Moreover, the total cost of the recleaning was $10,645.87. Mistick's contention that ten percent (10%) of the cost was attributable to debtor's faulty work was unsubstantiated. No basis was provided for this percentage.

### iii) *Dumpster Charges*

█ The contract between debtor and Mistick required debtor, at its own expense, to remove from the site all trash generated by it.

Mistick provided dumpsters for debtor and all other subcontractors working on the project and paid to have them hauled away. The total cost to Mistick was $18,-876.50. Mistick claims that fifteen percent (15%)—or $2,831.47—is attributable to debtor.

This backcharge must be rejected for much the same reason as the previous one was rejected. The extent to which debtor used the dumpster in comparison with other subcontractors was not demonstrated. Mistick conceded that it had no basis for arriving at this figure.

---

**1.** As shall be seen, not even the few "backcharges" which arose prepetition may be set off against the prepetition debt owed by Mistick to debtor. Said "backcharges" are inappropriate.

**254**

iv) *Tub Repairs*

The contract between debtor and Mistick required debtor to protect its work from damage until accepted by the project manager and to repair all damage to the work caused by debtor.

Mistick spent $1,510.00 to repair damage to bathtubs installed by debtor and asserts that debtor should be backcharged the entire amount.

 This contention must be rejected for several reasons. The bathtubs installed by debtor were covered with a protective material. Defendants seem to read this contract provision as requiring plaintiff to utilize all due customary procedures to cover and protect the bathtubs. Thereafter defendant would require plaintiff to post a guard to insure their safe keeping. Surely this is not a reasonable reading of this contract provision and equally clearly plaintiff's protective measures were all the contract required. Moreover, the damage to the bathtubs was caused by Mistick and other subcontractors. Mistick's project manager testified that Mistick and the other subcontractors who were responsible for the damage agreed to share the cost of repairing the bathtubs. This "defense" is merely a creation having no substance.

v) *Toilet Seats*

 Doors to some of the bathrooms could not be completely closed because they struck against toilet seats installed by debtor. Mistick spent $138.50 to move the bathroom doors in order to alleviate the problem and claims that the entire amount is chargeable to debtor because debtor improperly positioned the plumbing fixtures in the rooms.

The amount spent by Mistick to correct the problem is not chargeable to debtor. Mistick's project manager testified that the problem was due to an error by Mistick, not debtor. The plumbing fixtures were properly installed by debtor.

vi) *Drywall/Piping/Stairwell*

 Mistick spent $315.00 to remove and replace a drywall in order to repair some pipes, to build a column around some pipes in a stairwell, and to build a bulkhead around copper pipes in a stairwell.

The contention that these costs are chargeable to Mistick is without any foundation. Mistick did not establish that the pipes in question had been installed by debtor. Other subcontractors working on the project—e.g., the subcontractor who installed the sprinkler system—also had installed pipes.

vii) *Labor Dispute*

 Work on the project was halted for a time because of mass picketing by a union protesting a subcontractor's use of non-unionized workers. Mistick incurred $5,121.82 in security costs and $7,175.75 in legal fees as a result of the work stoppage and seeks to backcharge debtor for the entire amount.

The contention that these costs are properly backchargeable to debtor is entirely without merit.

Debtor was not responsible for the work stoppage. It employed unionized labor for the project. The work stoppage was due to mass picketing initiated by a union protesting the use of non-unionized labor by the subcontractor installing the sprinkler system. Although debtor's workers refused to cross the picket line for one day, they reported for work the second day when debtor threatened to fire them if they continued to honor the picket line. No credible testimony was offered indicating any causal relationship between debtor's employees and this expense. To the contrary, this expense was caused by the activities of Mistick and others.

viii) *Hot Water Boiler*

 The vendor who supplied debtor with a hot water boiler which debtor installed at the project complained that debtor had failed to pay it $8,034.80 for the boiler and requested that Mistick help it get paid. Mistick seeks to backcharge debtor the full amount which it allegedly failed to pay the vendor.

This backcharge is wholly without merit and must be rejected. Mistick conceded at trial that it never paid the vendor for the boiler. Moreover, as has been noted, the order confirming debtor's plan of reorganization provided that suppliers who failed to object to their exclusion from Schedule C appended to debtor's plan by a specified date were barred from thereafter seeking payment from the general contractor or its surety. The vendor who supplied the boiler did not object to its exclusion from Schedule C.

Mistick is not entitled to backcharge debtor for this when it has not paid the vendor and apparently will not have to.

### ix) *Cleanup Costs*

Mistick spent $4,729.50 cleaning up the project as it neared completion. It seeks to backcharge debtor for a portion of the cost of removing debris and for moving a welding machine.

Mistick has not established that these particular costs are attributable to debtor. Accordingly, this backcharge must be denied.

### x) *Roof Repairs*

Mistick seeks to backcharge debtor $1,200.00 for having a third party install twelve (12) roof drains.

This backcharge is without merit. Mistick has offered no convincing reason why this backcharge should be assessed against debtor. The roof was installed by another subcontractor, not by debtor. The subcontractor who installed the roof asserted that the warranty on the roof would be voided if any other contractor worked on the roof.

To summarize, the backcharges asserted by Mistick against the unpaid contract balance are inappropriate and must be denied. Many of the backcharges appear to be fabrications and/or creations to avoid paying a just debt. They clearly do not appear to be well grounded in fact, warranted by existing law or a good faith argument or for the extension, modification or reversal of existing law. We seriously question whether they were interposed for a proper purpose.

Debtor is entitled pursuant to Count I of the complaint to recover $30,713.72 which is the difference between the original contract price ($365,000.00) plus the additional work orders ($28,680.56) minus the amount Mistick paid to debtor ($308,828.74) and the amount it paid to Penstan Supply ($54,138.10).

## COUNT II

Debtor asserts in Count II of the complaint that Seaboard is liable to it in the amount of $30,713.72 as a result of the surety bond it issued in connection with the project.

Seaboard's only defense is that debtor failed to give timely notice to Seaboard that it was making a claim under the bond.

This defense is without merit. As a general matter, a creditor is not required to give notice to the surety of a principal's default. *See Monsarratt v. Equitable Trust Co.*, 14 Pa.Super. 541 (1900). However, failure of the creditor to provide the surety with such notice will discharge the surety from liability to the creditor where the contract of suretyship requires that such notice be given to the surety. *See Union Surety & Guaranty Co. v. Stevenson*, 27 Pa.Super 324 (1905).

The surety bond issued by Seaboard in connection with the project contained the following provision:

4. The Surety shall have no obligation to Claimants under this bond until:

4.1. Claimants who ... have a direct contract with the Contractor have given notice to the Surety ... and sent a copy, or notice thereof, to the Owner, stating that a claim is being made under this Bond and, with substantial accuracy, the amount of the claim.

There was no other requirement under the bond agreement pertaining to notice to the surety. In particular, it contained no provision setting a time limitation on the notice given to the surety. Additionally, no indication of prejudice is shown by this defendant as a result of the timing of the notice given by debtor.

Debtor complied with the notice requirement of paragraph 4.1. On May 18, 1992, debtor sent a letter to Seaboard notifying it that debtor had a claim pursuant to the bond for the unpaid contract balance of $28,380.76. A copy of the letter was sent to Marriott Corporation, owner of the project.

Seaboard is also liable for the amount of the unpaid contract balance of $30,713.72 as set forth previously.

## COUNT III

Debtor alleges in Count III of the complaint that the unpaid contract balance of $30,713.72 constitutes an asset of the bankruptcy estate and should be turned over to debtor forthwith.

Section 542(a) of the Bankruptcy Code provides in pertinent part as follows:

.... [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use ... shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. section 542(a).

The following must be established in order to prevail in a turnover action:

(1) that the property in question is property of the bankruptcy estate; and

(2) that the trustee is entitled to use, sell, or lease the property.

*See In re Weiss–Wolf, Inc.,* 60 B.R. 969, 975 (Bankr.S.D.N.Y.1986).

The contract balance at issue in this case is estate property. That portion which was earned by debtor and to which it was entitled prior to the filing of the bankruptcy petition on May 19, 1990 is estate property pursuant to 11 U.S.C. section 541(a)(1). That portion which was earned postpetition is estate property pursuant to 11 U.S.C. section 541(a)(6) and/or (7).

Moreover, the contract balance may be used by debtor to make distribution to creditors in accordance with the confirmed plan of reorganization. Said sum is of significant value or benefit to the estate.

Mistick and Seaboard will be directed to turn over the unpaid contract balance to debtor forthwith.

An appropriate order shall be issued.

## ORDER OF COURT

AND NOW at Pittsburgh this 16th day of December, 1992, in accordance with the foregoing Memorandum Opinion, it is ORDERED, ADJUDGED and DECREED that judgment is entered in the amount of $30,713.72 in favor of plaintiff/debtor Sherry & O'Leary, Inc. and against defendants Tom Mistick & Sons, Inc., a/k/a Mistick Construction, and Seaboard Surety Company.

IT IS FURTHER ORDERED, ADJUDGED and DECREED that defendants turn over said sum to plaintiff/debtor forthwith.