

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-26-2003

# Montgomery Cty v. Microvote Corp

Precedential or Non-Precedential: Precedential

Docket 01-2998

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

## Recommended Citation

"Montgomery Cty v. Microvote Corp" (2003). *2003 Decisions.* Paper 766.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/766

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

　　　　Filed February 26, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 01-2998 and 01-2999

MONTGOMERY COUNTY

v.

MICROVOTE CORPORATION; CARSON MANUFACTURING
COMPANY, INC.; WESTCHESTER FIRE INSURANCE
CO., INC.

Westchester Fire Insurance Company,

　　　　Appellant in 01-2998

MICROVOTE CORPORATION; CARSON MANUFACTURING
COMPANY, INC.; WESTCHESTER FIRE INSURANCE
CO., INC.

Microvote Corporation,

　　　　Appellant in 01-2999

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 97-cv-06331)
District Judge: Honorable Robert F. Kelly

Argued on October 15, 2002

Before: BECKER, Chief Judge, ROTH
and ROSENN Circuit Judges

(Opinion filed: February 26, 2003)

　　　　John M. Elliott, Esquire
　　　　Timothy T. Myers, Esquire (Argued)
　　　　Meredith T. Shepherd, Esquire
　　　　Elliott Reihner Siedzikowski
　　　　 & Egan, P.C.
　　　　925 Harvest Drive
　　　　Blue Bell, PA 19422

　　　　 COUNSEL FOR APPELLEE

　　　　John R. Price, Esquire (Argued)
　　　　John R. Price & Associates
　　　　9000 Keystone Crossing, 150
　　　　Indianapolis, IN 46240

　　　　Robert T. Carlton, Jr., Esquire

(Argued)
Ellisworth, Carlton, Mixell &
 Waldman, P.C.
1105 Berkshire Blvd., Suite 320
Wyomissing, PA 19610

   COUNSEL FOR APPELLANT

OPINION OF THE COURT

ROTH, Circuit Judge:

Carson Manufacturing Company, Inc., and Microvote
Corporation sold an electronic voting system to Montgomery
County, Pennsylvania. Pursuant to the sales contract,
Microvote obtained a performance bond from Westchester
Fire Insurance Company, Inc. The voting system
malfunctioned in the November 1995 general election and
the April 1996 primary election. As a result, the County
filed a six count diversity action, alleging negligence by
Microvote and Carson, breach of warranty by Microvote and
Carson, breach of contract by Microvote, fraud by
Microvote, wrongful use of civil proceedings by Microvote,
and breach of the performance bond by Westchester.
Carson settled with Montgomery County shortly before trial,
and a jury returned a verdict against Microvote on the
breach of implied warranty cause of action and against

2

Westchester on the performance bond claim. Microvote and
Westchester appealed.

On appeal, Westchester claims that the District Court
erred in finding that the statute of limitations did not bar
this action. Westchester also raises various other
challenges to the District Court's jury charge and its denial
of Westchester's post-trial motions. Both Microvote and
Westchester contend that the District Court erred in its
refusal to admit into evidence the videotape deposition of
defendants' expert witness. They also claim that the District
Court should have limited Montgomery County's remedy to
repair and replacement of the defective machines and
should have off-set the judgment against them by the
amount of Carson's settlement with the County. For the
reasons stated below, we will affirm.

I. Facts and Procedural History

On May 25, 1994, the County entered into a written
contract with Microvote to purchase 900 direct recording
electronic voting machines (DREs), a central computer
system, computer software, and support services for a total
of $3,822,000. The bid explicitly stated that it was for an
"integrated voter registration and election system" and that
"Microvote is bidding the entire system, as specified,
including all requisite hardware and software." Microvote
manufactured the system software, Microvote Election
Management Software (MEMS), but it purchased the

machines and their internal software from Carson. The contract required Microvote personnel to operate the system during elections through 1995.

Pursuant to the sales agreement, Microvote obtained a performance bond from Westchester. The performance bond incorporated the sales contract by reference and contained a warranty that all materials, equipment, and labor will be furnished in a "complete and workmanlike manner." The performance bond required Microvote to provide Westchester with notice of any default. It did not require the County to give Westchester notice of default. Nor, did Westchester ever ask the County to provide notice of default. Westchester's affiliate, Universal, obtained a

$150,000 letter of credit as collateral on the performance bond. The letter of credit expired on June 1, 1996.

The DREs were phased in to use over the course of three elections: the November 1994 general election, the April 1995 primary election, and the November 1995 general election. The November 1995 election was the first time the County used all 900 DREs and the MEMS software. In the November 1995 general election, DREs repeatedly shut down. This resulted in long lines, in voters leaving polling stations before they voted, and in lost votes. The shut-downs occurred because the DREs would randomly turn themselves into power-fail mode. Apparently, the scroll motors were emitting power surges to the internal computer chips when the brushes in the scroll motors interacted with the casing of the motors to generate electromagnetic interference. The DREs' microcomputer chip would then shut down in order to protect the circuitry. Thus, when a voter pushed a button on a DRE to scroll to the next page, the scroll motor would activate, and the machine might randomly shut down in front of the voter. In this situation, the vote would be lost unless the voter re-voted. In addition, the MEMS software malfunctioned when counting the votes, causing Microvote employees to report the wrong "unofficial results" to the press.

The DRE malfunctions were haphazard. William Carson, the President and CEO of Carson, wrote to the County after the November 1995 general election that "the problem seems to appear and disappear for no particular reason." Carson admitted in an internal memorandum, and in his trial testimony, that the DREs had problems in the November 1995 election. Microvote's on-site manager in an internal memorandum also noted "serious problems" with the MEMS software. The software problems were not detected by pre-election testing because Microvote was making changes in the software up to the day before the election. Under the contract and Pennsylvania law, the system, including the software, should have been tested and certified prior to the election. MEMS, however, was not certified in Pennsylvania.

After the November 1995 election, County officials met with representatives from Microvote. At the meeting, the

County expressed its intention to return the defective system and seek a refund. Microvote's Sales Director responded that Microvote will "make certain that in April of next year we don't face any machine down time at all." On March 1, 1996, the Solicitor of Montgomery County notified Microvote that the County "considers you in default of your contract." Microvote claimed that additional machines would cure the problem and offered to provide the County with 390 additional "loaner" machines free of charge for the April 1996 primary election. The County agreed to give the DREs another chance. On March 13, 1996, the parties entered into an agreement under which the County maintained its position that Microvote was in breach of the May 25, 1994, sales contract but would use the 900 DREs the County owned, along with the 390 additional DREs on loan from Microvote, in the April 1996 election to determine if the system could function properly with additional DREs. Microvote made several attempts to cure the problems, including working on the motor brushes and retrofitting the machines with less sensitive computer chips. Nevertheless, the system failed again in the April 1996 primary election.

On June 28, 1996, the County replaced the DREs with 1,050 machines from another manufacturer that the County purchased for $5,617,500, less a $1,350,000 trade-in allowance for the Microvote machines.1  Neither the County, nor Microvote, notified Westchester of the default and Universal's Letter of Credit expired. Nor, however, did Westchester obtain a release from the County despite the fact that Westchester's policy required a completion letter from the County before allowing the Letter of Credit to expire. Moreover, Westchester twice attempted unsuccessfully to obtain written releases from the County.

On July 1, 1996, Microvote filed an action against the County in the United States District Court for the Eastern District of Pennsylvania. The complaint alleged that the County had breached an oral agreement to purchase 350 of the 390 DREs that Microvote had loaned the County. The District Court dismissed the action pursuant to Fed. R. Civ. P. 12(b)(6) on the ground that Pennsylvania law requires all

_____

1. The Microvote machines have been repurchased by other counties.

contracts with local governments to be in writing. We affirmed that decision in Microvote v. Montgomery County, 124 F.3d 187 (3d Cir. 1997).

On October 10, 1997, the County brought this diversity action, alleging breach of contract, of warranty, and of the

performance bond, as well as negligence, fraud, and wrongful use of civil process. Microvote moved to dismiss on grounds that the County should have raised the claims as compulsory counterclaims in Microvote v. Montgomery County, that the complaint was untimely, and there was a lack of personal jurisdiction. Alternatively, Microvote moved for a transfer of venue. The District Court denied the motions.

Following discovery, defendants moved for summary judgment. The District Court granted summary judgment to defendants on the negligence claim, the fraud claims arising prior to the November 1995 election, and the wrongful use of civil proceedings claim, but denied defendants' motion for summary judgment with respect to the remaining fraud claims, the breach of contract claim, the breach of warranty claim, and the performance bond claim. One week prior to the start of trial, Carson entered into a Covenant Not to Sue with the County.2

The jury trial commenced against Microvote and Westchester on October 18, 2000. At the close of the County's case, Microvote and Westchester moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The District Court reserved ruling on the motions. At the close of evidence, Microvote and Westchester renewed their motions, which the Court denied. On November 1, 2000, the jury returned a verdict. The jury found in favor of Microvote on the breach of contract, the breach of express warranties, and the fraud counts. However, the jury found that Microvote had breached implied warranties of merchantability and fitness for a particular purpose and

---

2. According to a newspaper article, of which the District Court took judicial notice, Carson paid the County $587,000 in exchange for the County agreeing not to sue Carson. At oral argument, plaintiff's counsel stated that the actual settlement was greater than the amount reported in the press.

that Westchester had violated the performance bond. The jury awarded Montgomery County $1,048,500 in damages.

In separate post-trial motions, Microvote and Westchester moved to amend the judgment, for relief from final judgment, for judgment as a matter of law, and for a new trial. The County also filed a post-trial motion seeking to mold the jury verdict, judgment as a matter of law, and a new trial. The District Court denied all the post-trial motions in separate orders dated June 25, 2001. Microvote and Westchester timely appealed. The County did not appeal the denial of its post-trial motion.

II. Jurisdiction and Standard of Review

The District Court had diversity jurisdiction over this matter pursuant to 28 U.S.C. S1332. We have appellate

jurisdiction pursuant to 28 U.S.C. S1291.

We subject "the District Court's interpretation of Federal Rule of Evidence 702 to plenary review. However, we review the District Court's decision to admit or exclude scientific evidence for an abuse of discretion." In re TMI Litig., 193 F.3d 613, 666 (3d Cir. 1999) (citation omitted). We exercise plenary review over an order denying a motion for judgment as a matter of law and apply the same standard as the District Court. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). Motions for judgment as a matter of law are granted only if, "viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Id.

The scope of review of erroneous jury instructions is whether the charge, "taken as a whole, properly appraises the jury of the issues and the applicable law." Smith v. Borough of Wilkinsburg, 147 F.3d 272, 275 (3d Cir. 1998) (citation and quotation omitted). We review a District Court's denial of a motion for a new trial pursuant to Fed. R. Civ. P. 59 and the denial of a motion pursuant to Fed. R. Civ. P. 60(b) for an abuse of discretion. See Reform Party of Allegheny County v. Allegheny County Dep't. of Elections, 174 F.3d 305, 311 (3d Cir. 1999); Olefins Trading Inc. v.

Han Yang Chem. Corp., 9 F.3d 282, 289 (3d Cir. 1993). An abuse of discretion occurs when "the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." Reform Party of Allegheny County , 174 F.3d at 311.

III. Discussion

A. Statute of Limitations and Nullum Tempus

The District Court did not err in denying Westchester's motion for judgment as a matter of law on the ground that the statute of limitations bars this action because the doctrine of nullum tempus occurit regi ("time does not run against the king") applies here. Under the doctrine of nullum tempus, the statute of limitations does not bar actions brought by the state or its agencies, unless a statute expressly so provides. See City of Philadelphia v. Lead Indus. Ass'n, Inc., 994 F.2d 112, 118 (3d Cir. 1993). "The rationale of this rule is that the Commonwealth, as a plaintiff, seeks the vindication of public rights and the protection of public property." Id.; accord Broselow v. Fisher, ___ F.3d ___ (3d Cir. 2003) (slip op. at 8). The County, however, is a political subdivision of the Commonwealth. The doctrine of nullum tempus is not available to political subdivisions of the state except in limited circumstances of obligations imposed by law:

    [S]tatutes of limitations cannot be pleaded against such

> political subdivisions when they are seeking to enforce
> strictly public rights, that is, when the cause of action
> accrues to them in their governmental capacity and the
> suit is brought to enforce an obligation imposed by law
> as distinguished from one arising out of an agreement
> voluntarily entered into by the defendant.

Lead Indus. Ass'n, Inc., 944 F.2d at 119 (quoting City of
Philadelphia v. Holmes Elec. Protective Co., 6 A.2d 884
(1939)).

Nullum tempus does not apply to a common law contract
claim against a political subdivision, arising out of a
voluntary agreement, because such a claim does not accrue
solely to a governmental entity. However, where a

8

subdivision of the Commonwealth is required by the
Constitution or by statute to engage in an activity, nullum
tempus applies to contracts entered into with private
parties in order to fulfill this duty. See Lead Indus. Ass'n,
Inc., 994 F.2d at 120-21 (holding that nullum tempus does
not apply where the City of Philadelphia and state housing
authorities bring an action against a lead paint
manufacturer and trade association to recover the cost of
abating lead paint in public housing because the plaintiffs
were not "required by law . . . to contract for the purchase
of lead-based paint or to construct the buildings in which
that paint was used."); Mt. Lebanon School Dist. v. W.R.
Grace and Co., 607 A.2d 756 (Pa. Super. Ct. 1992) (holding
that the doctrine of nullum tempus applies where a school
district brings breach of contract and tort claims against
contractors and manufacturers for defects in the
construction of school buildings because the school district
was required by the Constitution and statute to build the
schools and the school district contracted with private
parties in order to fulfil this duty); Stroudsburg Area School
Dist. v. R.K.R. Assoc./Architects, 611 A.2d 1276 (Pa. Super.
Ct. 1992), app. denied, 622 A.2d 1377 (1993) (same).

The nullum tempus doctrine applies in this case because,
as in Mt. Lebanon School District and Stroudsburg Area
School District, but unlike in Lead Industries Association,
Inc., the County was required by law to hold elections and
to procure electronic voting machines. The County was
required "[t]o purchase, preserve, store and maintain
primary and election equipment of all kinds, including . . .
voting machines." 25 P.S. S2642(c). Further, in November
1993, the citizens of the County voted to replace the
County's manual voting machines with electronic voting
machines. Following this vote, the County was required by
law to purchase electronic machines. Under Pennsylvania
law, if "a majority of the qualified registered electors voting
on the question in any county . . . vote in favor of the
adoption of an electronic voting system, the county board of
elections of that county shall purchase, lease, or otherwise
procure . . . the components of an electronic voting
system." 25 P.S. S3031.4(a). Thus, as in Mt. Lebanon School

District, the County is:

> unquestionably compelled by law . . . to provide
> [electronic voting machines]. The practical implications
> of such a duty require [the County], in [its]
> governmental capacity, to enter into contractual
> relations with private parties who can construct and
> maintain such suitable facilities. Where, as here, a
> cause of action accrues to a party in its governmental
> capacity and the suit is brought to enforce strictly
> public rights and an obligations imposed by . . .
> statute, such as that herein, the doctrine of nullum
> tempus applies.

Mt. Lebanon Sch. Dist., 607 A.2d at 762.

Further, contrary to Westchester's assertion, the
acquisition of the performance bond also was an obligation
imposed by law. Under Pennsylvania law:

> The successful bidder, when advertising is required
> herein, shall be required to furnish a bond with
> suitable reasonable requirements guaranteeing
> performance of the contract, with sufficient surety in
> the amount of fifty per centum (50%) of the amount of
> the contract, within thirty (30) days after the contract
> has been awarded, . . . unless the commissioners shall
> waive the bond requirement in the bid specification.

16 P.S. S5001(c). In this case, the bond requirement was
not waived in the bid specification.

Moreover, as the District Court held, the performance
bond should not be examined apart from the underlying
contract in determining whether nullum tempus applies.
The purpose of the performance bond was to ensure that
the County was able to perform its statutorily mandated
duty to obtain electronic voting machines. Therefore, in
bringing this action to recover under the performance bond,
the County was enforcing the obligation to provide
electronic voting machines imposed by law. As Microvote
represented at oral argument, the County most likely would
not be able to recover on its judgment absent the
performance bond because of Microvote's limited assets.

B. Expert Witness

The District Court did not abuse its discretion in
excluding the testimony of defendants' expert, Robert J.

Naegele. Federal Rule of Evidence (FRE) 702 was amended
in 2000 to provide that:

> If scientific, technical, or other specialized knowledge

will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FRE 702. This rule was amended in response to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). See FRE 702 Advisory Committee Notes. In Daubert, the Supreme Court established a "gatekeeping role for the judge" in determining the reliability and relevancy of expert testimony under FRE 702. Id. at 589. The Court stated:

Faced with a proffer of expert scientific testimony,. . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

Id. at 592-93.

Daubert identifies a non-exhaustive list of factors for consideration when determining the reliability of proffered testimony. This includes whether 1) a theory or technique is scientific knowledge that will assist the trier of fact; 2) the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and 4) the general acceptance of the theory or technique. Id.; see also Oddi v. Ford Motor Co., 234 F.3d 136, 145 (3d Cir. 2000), cert. denied , 532 U.S.

11

921 (2001); In re TMI Litig., 193 F.3d at 664; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994).

The Supreme Court concluded that the inquiry is a flexible one, but that trial courts should focus"solely on principles and methodology, not on the conclusions they generate." Daubert, 509 U.S. at 595. However, the Supreme Court has noted that conclusions and methodology are not entirely distinct from one another, and that a "court may conclude that there is simply too great a gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). Daubert was decided in the context of scientific knowledge, but the Supreme Court has extended its reasoning to the kind of "technical or other specialized knowledge" at issue here. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999).

While FRE 702 is the "primary locus" of a District Court's gatekeeping role, it also must look to other rules, including FRE 703. Daubert, 509 U.S. at 590; In re TMI Litig., 193 F.3d at 696. FRE 703 provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

FRE 703. When "a trial judge analyzes whether an expert's data is of a type reasonably relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert." In re TMI Litig., 193 F.3d at 697. If the data underlying "the expert's opinion are so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." Id.

In this case, the District Court acted within its discretion when it excluded the videotaped deposition of Naegele, author of the Federal Election Commission ("FEC")'s design performance and testing requirements for Punchcard Marksense and Direct Recording Electronic Voting Systems.

12

In the deposition, Naegele testified that the Microvote DREs met or exceeded the FEC standards in the April 23, 1996, primary election. While the District Court did not question Naegele's qualifications as an expert to offer such testimony, the testimony of a witness, who is well-qualified by experience, still may be barred if it is not based on sound data. See Kumho Tire Co., 526 U.S. at 153. The trial judge, after viewing the videotape deposition, held that the videotape was inadmissible because it was unreliable, noting that "I'm a little concerned about some of the things that were shown to him he didn't seem to know where they were from or what the source of them were. That, I find disturbing."

In his deposition,[3] Naegele indicates that he relied on a document prepared by Microvote's National Sales Director, Gary Greenhalgh, in which Greenhalgh, who was not present during the April 1996 elections, made a"reverse" "guestimate" about the amount of time that the machines were down. Greenhalgh did not base his determination on primary data. Naegele admitted that he did not know what the document was, who created it, or how it was created. Naegele also relied on other documents, some of which apparently were derived from the Greenhalgh document. Again, Naegele could not identify the source or basis of some of these documents, and Naegele admitted that he did not measure actual election use data to determine how long

the machines were down. While Naegele testified that he relied on audit trail tapes, these were a sampling of tapes that were selected by an attorney for Carson. See In re TMI Litig., 193 F.3d at 697-98 (holding that a District Court properly excluded expert testimony where the sole basis for the testimony was summaries prepared by a party's attorney).

Under these circumstances, we conclude that the District Court did not abuse its discretion in excluding Naegele's testimony because the court reasonably concluded that the data underlying Naegele's opinion was so unreliable that no reasonable expert could base an opinion on it. See id.

_____

3. Naegele was not subjected to cross-examination at his deposition because plaintiff 's attorney was not present.

C. Damages

The District Court did not err in denying defendants' motion for judgment as a matter of law on the ground that the exclusive remedy under the contract was repair and replacement of defective machines. It is clear from the law and the evidence that a reasonable jury could have concluded that monetary damages were available to the County. The Uniform Commercial Code provides as follows:

> (a) General rule.--Subject to the provisions of subsections (b) and (c) and of section 2718 (relating to liquidation or limitation of damages; deposits):
>
> (1) The agreement may provide for remedies in addition to or in substitution for those provided in this division and may limit or alter the measure of damages recoverable under this division, as by limiting the remedies of the buyer to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts.
>
> (2) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

13 Pa. C.S.A. S2719(a).

In this case, the repair and replacement remedy is an optional remedy, not the sole remedy, because Microvote and the County did not expressly agree that repair and replacement would be the exclusive remedy. The May 25, 1994 sales agreement provides as follows:

> It is further agreed that in case any of the said materials, equipment and/or supplies furnished and delivered under this contract are rejected by the authorized or proper County Agent as unsuitable or unfit, such materials, equipment, and/or supplies so

rejected shall be removed at once by [Microvote], and
other materials, equipment, and/or supplies of the
proper kind and quality, and fully up to the
requirements of the contract, furnished in place
thereof, to the satisfaction of County Agent, at the cost
and expense of [Microvote]; provided, however, that in
the event [Microvote] fails, neglects, or refuses to furnish

the replacement therefor within sixty (60) days after
receipts of written request so to do, County may
purchase said replacements and [Microvote] agrees to be
liable for costs thereof.

The remedies herein provided shall be in addition to
and not in substitution of the rights and remedies which
would otherwise be vested in [the County] under the
terms of this agreement, including those contained in
the bid, proposal, and specifications, all of which rights
and remedies are specifically reserved by [the County].

(emphasis added). Rather than expressly limiting the
County's remedy exclusively to repair and replacement, this
contractual provision explicitly states that the repair and
replacement remedy does not substitute for other remedies
and that the County retains the right to seek other
remedies.

D. Effect of Carson Settlement on Judgment Against
Microvote and Westchester

The District Court did not abuse its discretion in denying
defendants' motion pursuant to Fed. R. Civ. P. 60(b) to "off-
set" the judgment against non-settling defendants
Microvote and Westchester by the amount of money the
County received from co-defendant Carson as part of a
settlement. We come to this conclusion because the non-
settling defendants waived any claim to the settlement.
Under Pennsylvania law, a "non-settling tortfeasor is
required to pay his full pro-rata share." Charles v. Giant
Eagle Markets, 522 A.2d 1, 2 (1987). Accordingly, in Rocco
v. Johns-Manville Corp., we held that, under the
Pennsylvania Joint Tortfeasors Act, settlement by a joint
tortfeasor reduces the amount a plaintiff may recover from
the non-settling co-defendant to his pro rata share or the
amount paid for the release, whichever is greater. See 754
F.2d 110, 111 (3d Cir. 1985); 42 Pa.C.S.A. S8326. However,
"[u]nder Pennsylvania law, if the released party is not a
joint tortfeasor, he is considered a volunteer. In that
circumstance, the amount paid for the release is not
deducted from the recovery against a nonreleased party."
Id. In order to reduce a plaintiff 's recovery, the co-
defendant's culpability as a joint tortfeasor must be

established through adjudication or concession of joint

tortfeasor status in the settlement. See id. at 114-15.

In this case, as the District Court noted, neither Microvote nor Westchester submitted a jury interrogatory for apportionment of liability. On the contrary, Microvote took "violent exception" to special jury interrogatories proposed by Carson prior to settling that would have apportioned damages between Carson and Microvote. Further, defendants did not present any evidence at trial that would support a jury finding regarding apportionment. They did not attempt to keep Carson in the case in order to apportion liability, nor did they request substitution of a settlement that delineated Carson's pro-rata share of liability under Griffin v. United States, 500 F.2d 1059 (3d Cir. 1974). As we held in Rocco:

> One would have expected the nonsettling defendants to either have requested substitution of Griffin -type releases or judicial determination of liability. The nonsettling defendants took no action, apparently acquiescing in the settling part[y's] absence from the trial. That failure to act may be considered a waiver of any benefit from the [settling defendant's release] or the amounts paid for [it].

754 F.2d at 115. Since the jury did not apportion liability and the settlement did not mention the non-settling defendants' liability, Microvote and Westchester have waived any claim to the settlement under Giant Eagle Markets and Rocco.4

─────────────────────────────────────────────

4. Defendants argue that Giant Eagle Markets and Rocco do not apply to the present case because those cases involved tort claims, while the present case is for breach of warranty, which defendants claim is contractual in nature. It is unlikely that the Pennsylvania Supreme Court would adopt an off-set rule for breach of warranty claims that differs from the rule in the tort context in light of Williams v. West Penn Power Co., 467 A.2d 811 (1983) (holding that the statute of limitations for tort claims does not apply to breach of warranty claims, even if the breach results in a personal injury). In Williams, the Pennsylvania Supreme Court noted that:

> The Superior Court in [Salvador v. Atlantic Steel Boiler Co, 389 A.2d 1148 (Pa. Super. Ct. 1978), aff 'd, 424 A.2d 497 (1981)] strayed into

16

Even if defendants had not waived an off-set claim, the jury's verdict does not suggest that defendants are entitled to an off-set. The jury found that the County sustained damages in the amount of $1,048,500. This amount is about half of the difference between the value of the DREs as warranted ($3,822,000) and the trade-in value of the DREs ($1,348,500). Since the jury neither heard evidence regarding Carson's liability to the County, nor received instruction from the District Court that they were to determine Carson's liability, nothing in the verdict suggests that the $1,048,500 award represents the full amount of

damages that the County suffered from the actions both of the non-settling defendants and of Carson. See Giant Eagle Markets, 522 A.2d at 3 ("There is no basis for concluding the jury verdict must serve as a cap on the total recovery that a plaintiff may receive.").5

---

error by embracing a tort/contract dichotomy. The inherent fallacy of such a dichotomy is that in the area of products liability we enter the borderland of tort and contract. It is not a question of whether a claim sounds in tort or assumpsit. Rather it sounds in both. Therefore, there is no legitimacy in attempting to use such a dichotomy as the predicate for distinction as to the limitation to be given the action.

Id. at 817

5. We also conclude that Westchester's three remaining arguments lack merit. First, Westchester's argument that the District Court erred in declining to reduce the judgment against it by the amount that the jury found that Westchester had been prejudiced by the County's failure to timely notify it of Microvote's default lacks merit because the County had no contractual obligation to provide notice of default. Under Pennsylvania law, creditors such as the County are not required to provide notice to a surety that a principal has defaulted, unless the contract requires such notice. See United States v. Minnesota Trust Co., 59 F.3d 87, 90 (8th Cir. 1995); In re Sherry & O'Leary Inc., 148 B.R. 248, 256 (W.D. Pa. 1992). Second, even if the jury's verdict that Microvote breached implied warrantees of merchantability and fitness for a particular purpose are inconsistent with the jury's finding that Microvote did not breach the May 25, 1994, contract with the County, there is sufficient evidence to support the verdict on the breach of warranty claim and "consistent jury verdicts are not, in themselves, necessary attributes of a valid judgment." Mosley v. Wilson, 102 F.3d 85, 90 (3d Cir. 1996). In Mosley, this Court held that "in certain

17

IV. Conclusion

For the reasons stated above, the judgment of the District Court will be affirmed.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

---

circumstances, a court retains the authority, even in a civil case, to allow an apparently inconsistent verdict to stand." Id. (quoting Los Angeles v. Heller, 475 U.S. 796, 805 (Stevens, J., dissenting). Those circumstances are where the verdict appears to be the result of compromise, as opposed to jury confusion. See Heller, 475 U.S. at 806 n. 12, 806 n. 13 (Stevens, J., dissenting). In the present case, the apparently inconsistent verdict would appear to be the result of compromise, as evidenced by the fact that the jury awarded the County approximately half the expectation damages the County sought on its

breach of contract claim. Finally, the District Court did not err in declining to instruct the jury that the County could only recover for defective individual machines because the machines, along with the MEMS software, constitute one voting system.

18